IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| TONYA MARIE WHIPKEY, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | 2:10-CV-031 |
| § | |
| MICHAEL J. ASTRUE, § | |
| Commissioner of Social Security, § | |
| § | |
| Defendant. § | |

**REPORT AND RECOMMENDATION
TO AFFIRM THE DECISION OF THE COMMISSIONER**

Plaintiff TONYA MARIE WHIPKEY brings this cause of action pursuant to 42 U.S.C. § 405(g), seeking review of a final decision of defendant MICHAEL J. ASTRUE, Commissioner of Social Security (Commissioner), denying plaintiff's application for disability insurance benefits and supplemental security income benefits. Both parties have filed briefs in this cause. For the reasons hereinafter expressed, the undersigned United States Magistrate Judge recommends the Commissioner's decision finding plaintiff not disabled and not entitled to benefits be AFFIRMED.

I.
PROCEDURAL BACKGROUND

In September 2007, plaintiff applied for disability insurance benefits and supplemental security income, alleging she has been unable to work since August 14, 2006. (Transcript [hereinafter Tr.] 8). Plaintiff alleged disability due primarily to aortic valve replacement, high blood pressure, shortness of breath, and dizziness. (*Id.* 109). Both applications alleged the

disability began on August 14, 2006. (*Id.* 87, 92).

An administrative hearing was held on June 19, 2009. (*Id.* 20). At the time of the hearing, plaintiff was fifty-three years old and had past relevant work experience as a rancher and a nurse. (*Id.* 117). On August 18, 2009, an Administrative Law Judge (ALJ) issued an unfavorable decision denying plaintiff disability benefits at step five of the five-step sequential analysis based upon his conclusion that plaintiff could perform light-level work. (*Id.* 14). Upon the Appeals Council's denial of plaintiff's request for review, the ALJ's determination that plaintiff is not under a disability became the final decision of the Commissioner. (*Id.* 1). Plaintiff now seeks judicial review of the denial of benefits pursuant to 42 U.S.C. § 405(g).

II.
ISSUE PRESENTED

Plaintiff contends the Commissioner's findings as to plaintiff's residual functional capacity (RFC), and the resultant finding of non-disability, is not supported by substantial evidence.

III.
STANDARD OF REVIEW

A disabled worker is entitled to monthly social security benefits if certain conditions are met. 42 U.S.C. § 423(a). A worker is disabled if he or she cannot engage in substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or last for a continued period of twelve months. *Id.* § 423(d)(1)(A). The Commissioner has promulgated a five-step sequential evaluation process the ALJ must follow in making a disability determination. *See* 20 C.F.R. § 404.1520(b)-(f). The claimant has the initial burden of establishing a disability in the first four steps of the analysis. *Bowen v.*

*Yuckert*, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5, 96 L.Ed.2d 119 (1987). At the fifth step, the burden then shifts to the Commissioner to show the claimant is capable of performing work in the national economy. *Id.*

In reviewing the propriety of an ALJ's decision that a claimant is not disabled, the reviewing federal court's function is to ascertain whether the record as a whole contains substantial evidence to support the Commissioner's factual findings and whether any errors of law were made. *Anderson v. Sullivan*, 887 F.2d 630, 633 (5th Cir. 1989). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). It is more than a scintilla but less than a preponderance. *Id.,* 91 S.Ct. at 1427. To determine whether substantial evidence exists, four elements of proof must be weighed: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education, and work history. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)). While procedural perfection is not required, the ALJ does have a duty to fully and fairly develop the facts relating to a claim for disability benefits. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995).

If the Commissioner's findings are supported by substantial evidence, they are conclusive, and the reviewing court may not substitute its own judgment for that of the Commissioner, even if the court determines the evidence preponderates toward a different finding. *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980). Conflicts in the evidence are to be resolved by the Commissioner, not the courts, *Laffoon v. Califano*, 558 F.2d 253, 254 (5th

Cir. 1977), and only a "conspicuous absence of credible choices" or "no contrary medical evidence" will produce a finding of no substantial evidence. *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). The level of review is not *de novo*. Even if the ALJ *could* have found plaintiff to be disabled, the only issue a reviewing federal court may rule on is whether there was substantial evidence to support the ALJ's decision.

IV.
MERITS

Plaintiff challenges the ALJ's determination at step five of the five-step sequential analysis because the RFC, upon which the unfavorable determination was based, was not supported by substantial evidence. Specifically, plaintiff avers there was not substantial evidence supporting the determination she could perform work at the "light" level, especially since her heart was given a New York Heart Association class 3 assessment. Plaintiff submits the Commissioner should have ordered a consultative examination regarding her RFC and secured a statement from that examiner, and the ALJ's failure to do so constitutes reversible error. Review of the record indicates substantial evidence supports the Commissioner's determination.

*A. The Record Evidence*

1. Medical Evidence Regarding Aortic Valve Replacement

Plaintiff's medical records reflect plaintiff was admitted to the hospital in August 2006, when she went to the emergency room with chest pain and shortness of breath. (*Id.* 194). A cardiac catheterization performed by Dr. Ronald Chaffin revealed plaintiff had severe aortic stenosis. (*Id.* 194). Dr. Chaffin referred plaintiff to Dr. Masoud Alzeerah, who successfully replaced plaintiff's aortic valve during heart surgery on August 11, 2006. (*Id.* 191-93). Plaintiff

was discharged from the hospital on August 18, 2006 "in good general condition." (*Id.* 190). At the time of her discharge from the hospital, Dr. Alzeerah described plaintiff's heart condition as "New York Heart Association class 3 with syncope." (*Id.* 190). This is the only time a doctor gave plaintiff a New York Heart Association classification. As a result, this is the only classification on record.

On August 31, 2006, plaintiff had her first postoperative visit with Dr. Alzeerah, her heart surgeon. (*Id.* 202). At that time, Dr. Alzeerah noted plaintiff reported her energy level continued to improve and she had not had any syncope or near syncope. (*Id.*). Dr. Alzeerah indicated "she continues to do well." (*Id.*). A few weeks later, on September 12, 2006, plaintiff met with Dr. Chaffin, her cardiologist, for a follow up. (*Id.* 358). Dr. Chaffin's reports are difficult to understand. On the first page of all of Dr. Chaffin's reports, the following appears under the heading "ROS":

> *Endocrine / Neurological System*: Diaphoresis. Hair loss to extremities. - Negative
> Lightheadedness. Numbness. Headache.
> *Constitutional System*: Dizziness. Fatigue. Hair loss to extremities. Headache.
> *Ears*: Dizziness.
> *Integumentary / Lymphatic Systems*: Edema. Cyanosis. Stasis ulcer.
> *Gastrointestinal System*: Nausea. Vomiting.
> *Genitourinary System*: Nocturia
> *Psychiatric System*: -Negative disorientation.

(*Id.* 358) (emphasis in original). On the very next page, however, under the heading "REVIEW OF SYSTEMS," is the following notation:

> *Constitutional*
> -Negative for fatigue  - Negative for headache  - Negative for nausea

(*Id.* 359). Unfortunately, there is nothing before the Court providing guidance on how to properly interpret Dr. Chaffin's seemingly contradictory report. Additionally, there is no

indication in any of Dr. Chaffin's reports of the context in which the statements were made. For example, the September 12, 2006 report indicates "[n]egative for fatigue," but does not indicate whether plaintiff had no fatigue because she was not exerting herself, which seems likely less than two weeks after heart surgery, or whether she had no fatigue even upon normal exertion. (*Id.* 359). The September 12, 2006 report also indicates "Patient has a sedentary lifestyle." (*Id.* 360). There is no indication, however, of whether plaintiff's lifestyle in general both before and after the surgery and into the foreseeable future was what Dr. Chaffin would consider "sedentary" or whether her lifestyle was "sedentary" because she was recovering from a recent heart surgery.

Dr. Chaffin's next report on plaintiff's condition, dated October 16, 2006, is likewise ambiguous. The report indicates plaintiff's "dominant complaint was that she occasionally felt dizzy. She also has had headaches." (*Id.* 352). On the next page of the same report, however, Dr. Chaffin states "-Negative for fatigue  - Negative for headache  - Negative for nausea . . . - Negative for dizziness." (*Id.* 353).

On December 21, 2006, plaintiff returned to Dr. Alzeerah for her second postoperative visit. (*Id.* 201). At that time, plaintiff "complain[ed] of occasional fatigue and dizziness, but she hasn't had any syncope or near syncope. Her energy level continues to improve . . . Overall she has done very well." (*Id.*). On January 17, 2008, plaintiff returned to Dr. Alzeerah for a follow up. (*Id.* 327). At that time, plaintiff was "complain[ing] of some fatigue . . . She does not have any shortness of breath on exertion. She has no history of syncope or near syncope . . . Overall she is not very active, due to her fatigue problem." (*Id.* 327). Dr. Alzeerah concluded plaintiff was "continu[ing] to do well, and clinically appear[ed] to be stable." (*Id.*).

At the hearing before the ALJ on June 19, 2009, plaintiff testified regarding her heart health since the aortic valve replacement. Plaintiff stated the ailments from which she suffered before the heart surgery, including dizziness, headaches, and fatigue, were improved but not completely resolved by the heart surgery. (*Id.* 26, 30). Plaintiff stated she has headaches up to twice a week, which sometimes last all day long (*Id.* 26-27); experiences "dizzy spells" approximately three times a week, each lasting a few minutes (*Id.* 27); and is "kind of short of breath all the time" (*Id.*).

2. Medical Evidence Regarding Cholelithiasis

In her pleadings to this Court, plaintiff primarily challenges the Commissioner's determination regarding the limitations she suffers due to her aortic valve replacement. Review of the record regarding the Cholelithiasis, however, are instructive in the analysis of her limitations due to her heart issues.

At the time of her heart surgery in August 2006, plaintiff was diagnosed with Cholelithiasis, commonly known as gallstones. (Tr. 189). The medical record indicates plaintiff did not complain of having gallbladder problems again until September 2007. (*Id.* 219). Plaintiff was referred from her general provider to Dr. Bobby Smith. (*Id.*). On September 19, 2007, plaintiff told Dr. Smith that "she has been having pain for many years." (*Id.* 224). Dr. Smith advised plaintiff to schedule a laparoscopic cholecystectomy to have her gallbladder removed. (*Id.* 225). Dr. Smith's report indicates that plaintiff said she had a history of hypertension and aortic valve replacement but did not experience any dizziness. (*Id.* 224). Plaintiff did, however, report she suffered from shortness of breath upon exertion. (*Id.*). Also, plaintiff indicated her profession was as a care giver for her family. (*Id.*).

In addition to consulting with Dr. Smith, plaintiff had Dr. Chaffin evaluate her to determine whether she could safely undergo gallbladder removal surgery given the condition of her heart. In September 2007, Dr. Chaffin stated plaintiff "certainly may have gallbladder surgery." (*Id.* 231). As detailed above, it is unclear whether the other areas of Dr. Chaffin's report concerning dizziness or shortness of breath are specific evaluations of plaintiff. It appears plaintiff complained of dizziness but not of fatigue or headaches. (*Id.* 232). Plaintiff also went to Dr. Pathom Thavaradhara for a pre-operative pulmonary evaluation. (*Id.* 292). In October 2007, plaintiff reported to Dr. Thavaradhara that she occasionally had shortness of breath upon exertion. (*Id.*). Her stated occupation was "Ranch." (*Id.* 298). Dr. Thavaradhara concluded plaintiff had "mild COPD stage II, S/P aortic vale [sic] prosthesis, HTN, which are all stable" and cleared her for the surgery. (*Id.*).

Despite Dr. Smith's recommendation and Drs. Chaffin's and Thavaradhara's approval for plaintiff to undergo the surgery, plaintiff never had the gallbladder removal surgery performed. At the hearing before the ALJ, plaintiff did not specifically testify about why she never had the gallbladder surgery. She did, however, testify that, at the time, she was struggling to pay her doctors' bills and was unable to go to any doctor because she could not afford it. (*Id.* 21).

3. The ALJ Hearing and the Commissioner's Determinations

On December 5, 2007, Dr. John Durfor, a state agency medical consultant for the Commissioner, completed a Residual Functional Capacity (RFC) Assessment on plaintiff. (Tr. 313). It appears Dr. Durfor did not personally examine plaintiff, but did review her medical record. Dr. Durfor concluded plaintiff could occasionally lift up to twenty pounds and frequently lift up to ten pounds. (*Id.* 314). He determined plaintiff could stand and/or walk and sit for

about six hours in an eight-hour workday. (*Id.*). In justifying these conclusions, Dr. Durfor explained:

> 52 yr old f alleging aortic valve replacement, high blood pressure, shortness of breath, and dizziness. 8/11/06 AORTIC VALVE REPLACEMENT. 9/19/07 - c/c gallstones. Temp 99.8 OX3, no resp distress, heart normal, lungs cta, no wheezes, rales, no c/c/e. CNS fully intact. Dx cholelithiasis, Nos, htn benign, artificial aortic valbe in situ. 10/3/07 Chest x-ray no acute cardiopulmonary disease. 10/3/07-NAD, no c/c/e, b/p 120/76. Chest fair excursions and clear breath sounds, heart regular, no gallops. Impression - probably mild COPD, s/p aortic valve prostheses, htn stable.

(*Id.* 314, sic throughout). Finally, Dr. Durfor stated plaintiff's allegations of limitations were partially supported by the record evidence. (*Id.* 318).

On March 10, 2008, Dr. Robin Rosenstock, also a state agency doctor, affirmed Dr. Durfor's RFC Assessment. (*Id.* 344). Dr. Rosenstock relied upon the notes of Dr. Alzeerah from January 17, 2008. (*Id.*). Dr. Rosenstock stated: "Per MER from Dr. Masoud A. Alzeerah dated 1/17/08 notes clmt [sic] experiencing fatique [sic] with no admits [sic] to hospital, no evidence of major cardiac event and no [shortness of breath] on exertion . . . clinically stable, to be seen in 2009 for [follow-up]." (*Id.*).

At the hearing before the ALJ, plaintiff testified she was unable to work because she did not "have the air or anything, or the strength for it." (*Id.* 21). She also testified that, without warning, she gets "dizzy spells" approximately three times a week. (*Id.* 22, 27). She remains dizzy for "just a couple of minutes." (*Id.* 27). She additionally testified that she had gallbladder problems and arthritis in her knees and hips. (*Id.* 25, 29). Plaintiff also stated she suffered from fatigue, "pretty much still going on all the time" although it was "a little bit better." (*Id.* 30). Regarding her memory, plaintiff testified, "I can't remember things like I ought to." (*Id.* 28).

Plaintiff stated she could stand for no more than one-and-a-half to two hours before she

had to rest.  (*Id.* 22-23).  She could sit for no longer than thirty minutes.  (*Id.* 23).  Inasmuch as housework was concerned, plaintiff stated she could perform all housework, it simply took her "a while to do it."  (*Id.* 23).  She later clarified, however, that she was unable to mop.  (*Id.* 28). When she was doing dishes, she could work for approximately twenty minutes before she had to rest.  (*Id.* 29).  She frequently spent the entire day in the house, and any traveling she did do was within a very small town or in the country.  (*Id.* 29-30).

Plaintiff stated the heaviest thing she could carry was a bag (of unspecified weight) of dog food.  (*Id.*).  The following exchange also occurred during the hearing:

> Q   Tell me about the extent of your activity on a relatively good day.  Tell me about one that's not very good.
>
> A   Well, going to the barn just, you know, the girls are always wanting me to go down there and see the calves, so I walk down there and stay with them for a little while, and I get wore [sic] out and I go back home . . . .
>
> Q   Uh-Huh.  And what about a day that's not so good?
> A   I don't hardly do anything.

(*Id.* 24-25).  Plaintiff stated that two days prior to the day of the hearing, she had experienced a "bad" day.  She stated,

> A   [I] just didn't feel good and, and my gall bladder's been bothering me lately, and it's really bothering me today.  But my headache, my head just won't quit hurting, and I'm not supposed to take hardly anything because of the medication I take.
>
> Q   Does a month go by that you don't have a bad day?
>
> A   No.  Sometimes I'm just tired, but some, but if the headache's gone and everything, I don't complain much.

(*Id.* 25-26).  Plaintiff testified her dizziness and headaches were "better" than the way they were before the aortic valve replacement but that she still suffered from those ailments.  Her

headaches, she stated, occur up to twice a week and last all day. (*Id.* 26-27).

## B. Elements of Proof

### 1. Objective Medical Facts

There is no dispute in this case that plaintiff's aortic valve was replaced in August 2006, and plaintiff has been diagnosed with Cholelithiasis and Chronic Obstructive Pulmonary Disease (COPD). Unfortunately, there are few objective medical facts upon which to base a determination of how limiting these conditions are. *See Wren*, 925 F.2d at 126. Plaintiff had several x-rays and echocardiography studies performed on her immediately before and immediately after her heart surgery in 2006. (Tr. 182-91). The echocardiography taken before the surgery unsurprisingly indicated plaintiff suffered from severe aortic valve stenosis. (*Id.* 191). An intraoperative transesophageal echocardiogram showed plaintiff's aortic valve was successfully replaced with a mechanical aortic valve during the surgery. (*Id.* 193). X-Rays of plaintiff's heart taken in the days following surgery did not indicate any problems with the valve or response of the heart to the mechanical valve. (*Id.* 182-89). The only other x-ray of plaintiff's heart was taken on October 3, 2007, over one year after the surgery. (*Id.* 295). That x-ray indicated plaintiff's heart was normal in size. (*Id.*). There was no acute cardiopulmonary disease, and the doctor did not note the existence of any other problems with plaintiff's heart at that time. (*Id.*).

In sum, the limited objective medical evidence indicated plaintiff had physically recovered from her aortic valve replacement. There is nothing from this evidence to indicate plaintiff was unable to perform light-level work. To the contrary, this evidence indicated plaintiff's heart surgery was completely successful. This evidence supports the ALJ's

determination. *See Taylor v. Bowen*, 782 F.2d 1294, 1298 (5th Cir. 1986) (holding "[a] medical condition that can be reasonably remedied is not disabling").

2. Diagnoses and Opinions of Treating and Examining Physicians

Plaintiff's chief complaints deal with problems undetectable and unmeasurable by objective medical tests. For indications of how much plaintiff was limited by her problems secondary to her aortic valve, even after heart surgery, the Court looks to the diagnosis and opinions of plaintiff's treating doctors.

One week after plaintiff's heart surgery, Dr. Alzeerah, plaintiff's heart surgeon, gave plaintiff's heart a New York Health Association rating of 3. (Tr. 190). From that point forward, Dr. Alzeerah indicated the prosthetic aortic valve was working well, and plaintiff's condition was improving. (*Id.* 202). In fact, at the first post-operative appointment, Dr. Alzeerah "encouraged [Whipkey] to increase her activity as tolerated." (*Id.*). Approximately four months after the surgery, Dr. Alzeerah concluded plaintiff had done well. (*Id.* 201). In early 2008, the doctor again concluded plaintiff was doing well and in stable condition. (*Id.* 327). At that visit, Dr. Alzeerah performed a cardiovascular physical examination. While the Court is not qualified to interpret that medical test, it notes Dr. Alzeerah did not indicate there were any problems with plaintiff's heart.[1] While plaintiff complained of fatigue to Dr. Alzeerah, the doctor did not make any indication validating plaintiff should be fatigued even after valve replacement. (*See id.* 327). To the contrary, Dr. Alzeerah recommended plaintiff become involved in a regular exercise program. (*Id.*). Finally, Dr. Alzeerah indicated in January 2008 plaintiff "does not have any shortness of breath on exertion." (*Id.*).

---

[1] Dr. Alzeerah "made arrangements" for plaintiff to undergo an echocardiography. (Tr. 327). The Court has been unable to locate the result or interpretation of that test in the record before it.

Dr. Chaffin, plaintiff's cardiologist, also routinely saw plaintiff. As discussed above, Dr. Chaffin's reports are difficult to interpret because they appear to contain many contradictions on several important points. Some portions of Dr. Chaffin's reports, however, are clear. In September 2006, Dr. Chaffin indicated plaintiff's "only problem is that she developed shingles over the left chest." (*Id.* 358). In October 2006, the doctor indicated plaintiff "has had no syncope or near syncopal episodes . . . Her dominant complaint was that she occasionally felt dizzy. She also has headaches. (*Id.* 352). Regarding the condition of plaintiff's heart: "Regular rhythm. Prosthetic aortic valve. S1 is normal. S2 is normal. No shocks. No rubs. No S3. No S4. No thrills. No cardiomegaly by percussion. PMI is diffuse near midclavicular line. Prosthetic aortic valve." (*Id.*).

Approximately one year later, Dr. Chaffin again saw plaintiff for a preoperative evaluation for gallbladder removal surgery. (*Id.* 231). The intelligible portion of the doctor's notes indicate the doctor considered plaintiff's heart strong enough to withstand the surgery. (*Id.*). His notations regarding the condition of plaintiff's cardiovascular system were identical to those made in the October 2006 report, quoted above. *(Id.* 235, 352). The doctor stated he "reviewed diet, exercise, and appropriate lifestyle modifications," but he failed to specify exactly what his recommendations were. (*Id.* 236).

In October 2007, Dr. Thavaradhara examined plaintiff. He concluded plaintiff had "mild COPD stage II, S/P aortic valve prosthesis, HTN, which are all stable." (*Id.* 292). This doctor also cleared plaintiff for gallbladder surgery. *(Id.)*. Also at that time, Dr. Smith evaluated plaintiff and concluded her heart and lungs were functioning normally. (*Id.* 225).

In sum, of all of the physicians who treated and examined plaintiff, none advised plaintiff

to limit her activities in any way. This was so even when she represented she was active as a care giver for her family (*Id.* 224) and worked on a ranch (*Id.* 298). In fact, at least one of plaintiff's doctors advised her to begin regular exercise. Common sense dictates a doctor would limit the activities of someone suffering from severe headaches, fatigue, shortness of breath, dizziness, and memory loss if that doctor thought the person was too active or pushing herself too hard. It seems unlikely for a doctor to instruct such a person to start routinely exercising. The opinions and diagnoses of plaintiff's treating physicians were the basis of the state agency doctor's RFC determination. (*See id.* 313-20). None of those doctors ever pronounced plaintiff disabled or otherwise limited her activity. This fact supports the determination of no disability. *See Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (citing *Harper v. Sullivan*, 887 F.2d 92, 97 (5th Cir. 1989) ("substantial evidence supported ALJ's finding that claimant's subjective symptomology not credible when no physician on record stated that claimant was physically disabled")).

      Plaintiff contends the ALJ acted improperly by failing to have an examining physician complete the RFC assessment. That assessment, however, was based upon a careful evaluation of the medical evidence. (*See* Tr. 313-20, 344). Neither the initial RFC determination of Dr. Durfor nor the later affirmation of that determination by Dr. Rosenstock contradicted any recommendations or findings of an examining physician. Therefore, the ALJ was not required to base his decision on an RFC created by an examining physician; his reliance on an RFC created and affirmed by a non-examining physicians was permissible. *See Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 199).

3. Claimant's Subjective Evidence of Disability

Plaintiff's statements to the ALJ at the hearing regarding her disability is detailed in section IV.A.3, above. Plaintiff told the ALJ she suffered from many limiting impairments. She was not as consistent in her complaints to her doctors, however. The pertinent portion of plaintiff's medical history began in August 2006, when plaintiff's heart problems came to a head and she had to undergo heart surgery. After her release from the hospital, plaintiff rarely saw her doctors. Specifically, she saw Dr. Alzeerah, her heart surgeon, in August and December 2006 and January 2008. She saw Dr. Chaffin, her cardiologist, in September and October 2006 and in September 2007. The medical record extends to the time of the hearing before the ALJ in June 2009. The record indicates plaintiff never sought treatment specifically for the problems she contends she suffered after her heart surgery. She never saw a doctor in an effort to treat her day-long headaches, fatigue, dizziness, shortness of breath, or memory loss. Rather, the only time plaintiff saw her primary doctors was for routine follow-up visits or for the purposes of approval to undergo gallbladder removal surgery. Plaintiff's failure to seek treatment for her ailments contradicts her later complaints to the Commissioner that those problems were disabling. *See Fraga v. Bowen*, 810 F.2d 1296, 1303 (5th Cir. 1987).

When plaintiff did see one of her doctors, her complaints were limited and varied. In her first post-operative visit with Dr. Alzeerah, plaintiff reported: "Her energy level continues to improve . . . She complains of occasional weakness, but her energy level continues to improve." (Tr. 202). Plaintiff told Dr. Alzeerah at that time, "overall she is very pleased with the results of the surgery." (*Id.*). In December 2006, plaintiff complained to Dr. Alzeerah of "occasional fatigue and dizziness." (*Id.* 201). The next time she saw Dr. Alzeerah, in January 2008, plaintiff

indicated she had "some fatigue." (*Id.* 327). She also told the doctor she "does not have any shortness of breath on exertion." (*Id.*). The Court notes plaintiff's representations to Dr. Alzeerah regarding her shortness of breath are directly in contradiction to plaintiff's testimony before the ALJ that she was "short of breath all the time." (*Id.* 29). Finally, Dr. Alzeerah did not ever note any complaints of headaches, memory problems, or dizziness.

Plaintiff did tell Dr. Chaffin in October 2006 that she suffered from occasional dizziness and headaches. (*Id.* 231). When she returned to Dr. Chaffin in September 2007, however, she had no complaints of shortness of breath, dizziness, headaches, or memory problems. (*Id.* 231-36). A day after she visited Dr. Chaffin in September 2007, however, plaintiff told Dr. Smith she did experience shortness of breath which worsened upon exertion. (*Id.* 445). She also told Dr. Smith she did not experience dizziness. (*Id.*). This is contrary to plaintiff's testimony before the ALJ that she experienced "dizzy spells" approximately three times a week. (*Id.* 27). One month later, in October 2007, plaintiff told Dr. Thavaradhara she experienced shortness of breath with exertion. (*Id.* 292). Dr. Thavaradhara did not indicate plaintiff complained of any other problems.

In sum, regarding fatigue, it appears plaintiff never complained of fatigue to doctors Chaffin, Smith, or Thavaradhara. She only complained of fatigue to Dr. Alzeerah. The latest date she complained of "some fatigue" was in January 2008, which was approximately a year and a half before the ALJ hearing. (*Id.* 327). Regarding shortness of breath, plaintiff complained of shortness of breath only to doctors Smith and Thavaradhara. She specifically denied shortness of breath a few months later, however, when she saw Dr. Alzeerah. Regarding dizziness, the final notation of plaintiff experiencing dizziness was in December 2006, at an

appointment with Dr. Alzeerah. She specifically denied experiencing dizziness, however, when she spoke with Dr. Smith in September 2007. Regarding headaches, the only time plaintiff ever complained of suffering from headaches was to Dr. Chaffin in October 2006. No doctor after that point in time ever indicated headaches were a problem for plaintiff. Regarding memory problems, plaintiff never complained of such problems to any of her doctors. The ALJ's determination to not give full force to plaintiff's representations at the hearing seem justified considering her inconsistent and contradictory statements to her treating physicians. The ALJ's statement, plaintiff "had problems with dizziness, shortness of breath, syncope, and headaches but most of these symptoms have been resolved with the placement of her aorta valve replacement," (*Id.*), is an accurate interpretation of the record. Plaintiff's inconsistent and contradictory statements regarding her many ailments, for which she never sought treatment, do not provide substantial evidence upon which a determination of disability could be based. *See Wren*, 925 F.2d at 126.

### 4. Plaintiff's Age, Education, and Work History

At the time she alleged she became disabled, plaintiff was fifty-one years old. (Tr. 14). She had a high school education. (*Id.*). Her work history consisted of working as a nurse from 1990 to 1996 and as a ranch laborer from 1996 to 2006. (*Id.* 117). While it is not clear exactly what work she was performing at the time, the Earnings Report on plaintiff indicates that in 2007 plaintiff earned $3500.00. (*Id.* 103). Plaintiff additionally testified that her step-father pays her approximately $500.00 a month for tending to him. (*Id.* 20-21).

There is nothing in plaintiff's age, education, and work history indicating the ALJ should have reached a conclusion different from the one reached. 20 CFR Part 404, Subpart P,

Appendix 1, §§ 202.13-.15. The fact plaintiff was able to continue work in 2007, when she claimed to be disabled as of August 2006, favors the Commissioner's determination. *See* 20 C.F.R. § 404.1571; *Fraga*, 810 F.2d at 1305 (holding the ability to work despite alleged disability supports ALJ's finding of not disabled). Disregarding the fact that plaintiff was, at the time of the hearing, earning approximately $6,000.00 a year from her step-father, plaintiff was clearly working in 2007, after the alleged disability onset date. This fact supports the ALJ's determination plaintiff was not under a disability as of August 2006. *See id.*; (Tr. 13).

Evaluating the objective medical facts, diagnoses and opinions of treating and examining physicians, plaintiff's subjective evidence of pain and disability, and plaintiff's age, education, and work history, the Court concludes substantial evidence supports the Commissioner's determination. *See Wren*, 925 F.2d at 126. While the better practice may have been for the ALJ to rely upon the RFC of a treating physician, plaintiff has failed to show error in the RFC upon which the ALJ did rely. *See Vaughan*, 58 F.3d at 131. Plaintiff's sole ground of error is without merit.

## V.
## RECOMMENDATION

THEREFORE, for all of the reasons set forth above, it is the opinion and recommendation of the undersigned United States Magistrate Judge to the United States District Judge that the decision of the defendant Commissioner finding plaintiff not disabled and not entitled to a period of disability benefits be AFFIRMED.

## VI.
## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and

CEA\SS\RR\Whipkey-31.affirm.doc: 3

Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this 13th day of September, 2011.

_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

### * <u>NOTICE OF RIGHT TO OBJECT</u> *

Any party may object to these proposed findings, conclusions and recommendation. In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line. Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E). **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).